**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO.

AUDEMARS PIGUET HOLDING SA,
COMPAGNIE DES MONTRES LONGINES,
FRANCILLON S.A., HENRI STERN WATCH
AGENCY, INC., HUBLOT SA, GENÈVE, LVMH
SWISS MANUFACTURES SA, MOVADO LLC,
OMEGA SA, PAMP SA, TISSOT SA, and TURLEN
HOLDING SA,

               Plaintiffs,

vs.

THE INDIVIDUALS, PARTNERSHIPS AND
UNINCORPORATED ASSOCIATIONS IDENTIFIED
ON SCHEDULE "A,"

               Defendants.

_____/

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiffs, Audemars Piguet Holding SA, Compagnie des Montres Longines, Francillon

S.A., Henri Stern Watch Agency, Inc., Hublot SA, Genève, LVMH Swiss Manufactures SA,

Movado LLC, Omega SA, Pamp SA, Tissot SA, and Turlen Holding SA (collectively

"Plaintiffs"), hereby sue Defendants, Individuals, Partnerships, and Unincorporated Associations

identified on Schedule "A" (collectively "Defendants").  Defendants are promoting, selling,

offering for sale, and/or distributing goods bearing counterfeits and confusingly similar

imitations of Plaintiffs' trademarks within this district through various Internet based e-

commerce stores, social media accounts, and commercial Internet website operating under their

seller identities and domain names set forth on Schedule "A" hereto (the "Seller IDs and Subject

Domain Name"). In support of their claims, Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1.     This is an action for federal trademark counterfeiting and infringement, false designation of origin, common law unfair competition, and common law trademark infringement, pursuant to 15 U.S.C. §§ 1114, 1116, and 1125(a), The All Writs Act, 28 U.S.C. § 1651(a), and Florida's common law. Accordingly, this Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.

2.     Defendants are subject to personal jurisdiction in this district, because they direct business activities toward and conduct business with consumers throughout the United States, including within the State of Florida and this district through at least the Internet based e-commerce stores, social media accounts, or fully interactive commercial Internet website accessible in Florida and operating under the Seller IDs and Subject Domain Name.

3.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 since Defendants are, upon information and belief, aliens engaged in infringing activities and causing harm within this district by advertising, offering to sell, selling, and/or shipping infringing products into this district.

## THE PLAINTIFFS

4.     Audemars Piguet Holding SA ("Audemars Piguet") is a societe anonyme organized under the laws of Switzerland, having its principal office in Le Brassus, Switzerland. Audemars Piguet, through and in connection with related companies, designs, manufactures, markets, and sells watches and related goods throughout the world, including within this district,

under multiple world-famous common law and federally registered trademarks including the trademarks identified in Paragraph 27 below.

5.     Compagnie des Montres Longines, Francillon S.A. ("Longines") is a corporation organized and existing under the laws of Switzerland with its principal place of business located in Saint-Imier, Switzerland.  Longines manufactures, markets, and sells watches and related goods throughout the world, including within this district, under multiple world-famous common law and federally registered trademarks including the trademarks identified in Paragraph 33 below.

6.     Henri Stern Watch Agency, Inc.  ("Henri Stern") is a corporation organized and existing under the laws of the State of New York with its principal place of business in the United States New York, New York.  Henri Stern is a subsidiary of Patek Philippe SA Geneve, a societe anonyme organized under the laws of Switzerland.  Patek Philippe SA Geneve designs, develops, and markets Patek Philippe brand watches and related goods.  Henri Stern is the exclusive importer and distributor of Patek Philippe brand watches in the United States.  Patek Philippe SA Geneve and Henri Stern are collectively referred to herein as "Patek Philippe." Patek Philippe designs, develops, markets, and sells watches and related goods throughout the world, including within this district, under multiple world-famous common law and federally registered trademarks including the trademarks identified in Paragraph 39 below.

7.     Hublot SA, Genève ("Hublot") is a societe anonyme organized under the laws of Switzerland with a principal place of business in Geneve, Switzerland.  Hublot, through and in connection with related companies, designs, manufactures, markets, and sells watches and related goods throughout the world, including within this district, under multiple world-famous

common law and federally registered trademarks including the trademarks identified in Paragraph 45 below.

8.      LVMH Swiss Manufactures SA ("LVMH") is a societe anonyme organized under the laws of Switzerland with a principal place of business in La Chaux-de-Fonds, Switzerland. LVMH, through and in connection with related companies manufactures, markets, and sells watches and related goods throughout the world, including within this district, under multiple world-famous common law and federally registered trademarks including the trademarks identified in Paragraph 51 below.

9.      Movado LLC ("Movado") is a limited liability company organized under the laws of the State of Delaware with its principal place of business in the United States in Wilmington, Delaware. Movado, through and in connection with related companies, manufactures, markets, and sells watches and related goods throughout the world, including within this district, under multiple world-famous common law and federally registered trademarks including the trademarks identified in Paragraph 57 below.

10.     Omega SA ("Omega") is a societe anonyme organized under the laws of Switzerland with its principal place of business located in Bienne, Switzerland.  Omega manufactures, markets, and sells watches and related goods throughout the world, including within this district, under multiple world-famous common law and federally registered trademarks including the trademarks identified in Paragraph 63 below.

11.     Pamp SA ("Pamp") is a societe anonyme organized under the laws of Switzerland with its principal place of business located in Castel San Pietro, Switzerland. Pamp, through and in connection with related companies, manufactures, markets, and sells precious metals products, including semi-finished precious metals products for the watch industries, throughout the world,

4

including within this district, under multiple world-famous common law and federally registered trademarks including the trademarks identified in Paragraph 69 below.

12.     Tissot SA ("Tissot") is a corporation organized and existing under the laws of Switzerland with its principal place of business located in Le Locle, Switzerland.  Tissot manufactures, markets, and sells watches and related goods throughout the world, including within this district, under multiple world-famous common law and federally registered trademarks including the trademarks identified in Paragraph 75 below.

13.     Turlen Holding SA ("Turlen") is a societe anonyme organized under the laws of Switzerland with its principal place of business located in Les Breuleux, Switzerland. Turlen, through and in connection with related companies manufactures, markets, and sells watches and related goods throughout the world, including within this district, under multiple world-famous common law and federally registered trademarks including the trademark identified in Paragraph 81 below.

14.     Each Plaintiff is a member of the Federation of the Swiss Watch Industry FH ("the Federation"), a non-profit trade association with its principal place of business in Bienne, Switzerland.  The Federation and its predecessors have been protecting the interests of the Swiss watch industry for more than 150 years.  The Federation is the Swiss watch industry's leading trade association with nearly 500 members, representing more than 90% of Swiss firms active in the production and sale of watches, clocks and components.  In 1999, the Federation created the Anti-Counterfeiting Group, which was established to combat common sources of counterfeit goods which cause a common harm to its members' respective brands, individually and to the Swiss watch industry in its entirety, which results in further harm to each member's brand.  Since 1999, the Federation through its anti-counterfeiting division, has worked with international law

enforcement and government agencies to conduct raids and investigations of counterfeit operations, as well as raise public awareness regarding the issue. The aim of the Federation is to contribute to the protection and development of the Swiss Watch Industry, to represent the latter to the Swiss authorities and to foreign and international authorities, and to defend the interests of its members on a judicial level.

15.     The Federation is authorized by the Swiss government to enforce the standards established by Swiss law concerning the geographical origin and quality associated with Swiss watches.  As part of its efforts to protect the use the Swiss geographical designation for watches, the Federation obtained certification trademarks for the terms Swiss and Swiss Made (collectively, "Swiss Marks"), which are valid and registered on the Principal Register of the United States Patent and Trademark Office and are used in connection with watches and other horological instruments of Swiss origin.  The Federation's members, including Plaintiffs, expend substantial resources ensuring that their genuine goods meet the exacting standards established by the Federation as part of a combined effort to guarantee that consumers can expect certain quality attributes from watches, including components thereof, permitted to use the Swiss and Swiss Made Marks in combination with Plaintiffs' own marks.

16.     Defendants, through the sale and offering to sell of counterfeit and infringing versions of Plaintiffs' respective branded products, are directly, and unfairly, competing with each Plaintiffs' economic interests in the United States, including within the State of Florida and causing each Plaintiff harm within this jurisdiction.

17.      Like many other famous trademark owners, Plaintiffs suffer ongoing daily and sustained violations of their respective trademark rights at the hands of counterfeiters and infringers, such as Defendants herein, who wrongfully reproduce and counterfeit Plaintiffs'

6

respective trademarks for the twin purposes of (i) duping and confusing the consuming public and (ii) earning substantial profits across their e-commerce stores. The natural and intended byproduct of Defendants' actions is the erosion and destruction of the goodwill associated with Plaintiffs' respective famous names and trademarks, as well as the destruction of the legitimate market sector in which they operate.

18.     In order to combat the indivisible harm caused by the combined actions of Defendants and others engaging in similar conduct, each year Plaintiffs expend significant resources in connection with trademark enforcement efforts, including legal fees, investigative fees, and support mechanisms for law enforcement such as field training guides and seminars. The exponential growth of counterfeiting over the Internet, particularly through online marketplace and social media platforms, has created an environment that require companies, such as Plaintiffs, to expend significant time and money across a wide spectrum of efforts in order to protect both consumers and themselves from the ill effects of confusion and the erosion of the goodwill connected to Plaintiffs' respective brands.

## THE DEFENDANTS

19.     Defendants are individuals, partnerships, and/or business entities of unknown makeup, each of whom, upon information and belief, either reside and/or operate in foreign jurisdictions, or redistribute products from the same or similar sources in those locations and/or ship their goods from the same or similar sources in those locations to shipping and fulfillment centers within the United States to redistribute their products from those locations.  Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).  Defendants target their business activities towards consumers throughout the United States, including within this district, through the operation of commercial Internet based e-commerce stores or social

media accounts via the Internet marketplace websites or social media platforms under the Seller IDs or the fully Interactive commercial Internet website under the Subject Domain Name.

20.     Defendants use aliases in conjunction with the operation of their businesses, including but not limited to those identified on Schedule "A."

21.     Defendants are the past and present controlling forces behind the sale of products bearing counterfeits and infringements of Plaintiffs' trademarks as described herein using at least the Seller IDs and Subject Domain Name.

22.     Defendants directly engage in unfair competition with Plaintiffs by advertising, offering for sale, and selling goods bearing counterfeits and infringements of one or more of Plaintiffs' respective trademarks to consumers within the United States and this district through Internet based e-commerce stores, social media accounts, or commercial Internet website using, at least, the Seller IDs and Subject Domain Name, and additional seller identification aliases or domain names not yet known to Plaintiffs.  Defendants have purposefully directed some portion of their illegal activities towards consumers in the State of Florida through the advertisement, offer to sell, sale, and/or shipment of counterfeit and infringing branded versions of one or more of Plaintiffs' goods into the State.

23.     Defendants have registered, established or purchased, and maintained the Seller IDs and Subject Domain Name. Defendants may have engaged in fraudulent conduct with respect to the registration of the Seller IDs and Subject Domain Name by providing false and/or misleading information to the Internet based e-commerce platforms or social media websites where they offer to sell and/or sell, or to their domain name registrar during the registration or maintenance process related to their respective Seller IDs and Subject Domain Name. Upon

information and belief, many Defendants have registered and/or maintained their Seller IDs and Subject Domain Name for the sole purpose of engaging in illegal counterfeiting activities.

24.      Defendants will likely continue to register or acquire new seller identification aliases and domain names for the purpose of selling and offering for sale goods bearing counterfeit and confusingly similar imitations of one or more of Plaintiffs' trademarks unless preliminarily and permanently enjoined.

25.      Defendants use their Internet-based businesses to infringe the intellectual property rights of Plaintiffs and others.

26.      Defendants' business names, i.e., the Seller IDs and Subject Domain Name, associated payment accounts, and any other alias seller identification names and domain names, used in connection with the sale of counterfeit and infringing goods bearing one or more of Plaintiffs' trademarks are essential components of Defendants' online activities and are one of the means by which Defendants further their counterfeiting and infringement scheme and cause harm to Plaintiffs.  Moreover, Defendants are using one or more of Plaintiffs' respective famous names and/or trademarks to drive Internet consumer traffic to their e-commerce stores, social media accounts, and/or website operating under the Seller IDs and Subject Domain Name, thereby increasing the value of the Seller IDs and Subject Domain Name and decreasing the size and value of Plaintiffs' legitimate marketplace at Plaintiffs' expense.

## **COMMON FACTUAL ALLEGATIONS**

### **Audemars Piguet's Rights**

27.      Audemars Piguet is the owner of the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "Audemars Piguet Marks"):

9

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| AUDEMARS PIGUET | 913,296 | June 8, 1971 | IC 014.Watch straps, and jewelry. |
| Royal Oak | 965,112 | July 31, 1973 | IC 014.  Watches and clocks and parts thereof |
| AUDEMARS PIGUET | 1,591,934 | April 17, 1990 | IC 014 - watches, clocks, stop watches, time recorders, chronometers, chronographs, watch movements, and parts of all the foregoing. |
|  | 2,866,069 | July 27, 2004 | IC 014. Watches, wristwatches, [ chronometers, ] chronographs for use as watches, watch faces and cases, all the aforesaid goods being of Swiss origin |
| AP AUDEMARS PIGUET | 2,873,707 | August 17, 2004 | IC 014. namely, watch cases, watch bands, watches, wristwatches |
| ROYAL OAK | 2,885,834 | September 21, 2004 | IC 014. watch cases, watch bands, watches, wristwatches |
|  | 3,480,826 | May 20, 2008 | IC 014. Cuff links, pendants; jewelry, bijouterie, timepieces, namely, watches, watch making materials, namely, alarm clocks, chronographs for use as timepieces and watches, dials for clock-and-watch making, boxes, caskets and cases for timepieces and jewelry |
| AP | 3,696,017 | October 13, 2009 | IC 014.  timepieces, namely, watches, wristwatches, clocks, chronographs for use as watches, watch straps; clock dials, watch cases |
| AP | 4,683,263 | February 10, 2015 | IC 014. Precious metals and alloys thereof and goods made of precious metals or coated therewith, namely, cufflinks, pendants, watches, alarm clocks, chronographs for use as timepieces and watches, dials for clock-and-watch making, boxes, caskets and cases for timepieces and jewelry, key rings of precious metal; jewelry; precious stones; timepieces and chronometric instruments |
| AUDEMARS PIGUET | 4,865,091 | December 8, 2015 | IC 014. Jewelry, timepieces and chronometric instruments |

The Audemars Piguet Marks are used in connection with the manufacture and distribution of high-quality goods in the category identified above.  True and correct copies of the Certificates of Registration for the Audemars Piguet Marks are attached hereto as Composite Exhibit "1."

28.     Long before the Defendants began their infringing activities complained of herein, the Audemars Piguet Marks have been used Audemars Piguet in interstate commerce to identify and distinguish Audemars Piguet's high quality goods for an extended period of time and serve as symbols of Audemars Piguet's quality, reputation and goodwill.

29.     Audemars Piguet and related companies expend substantial resources developing, advertising and otherwise promoting the Audemars Piguet Marks.  Audemars Piguet and related companies have spent significant monetary resources to extensively advertise and promote products under the Audemars Piguet Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Audemars Piguet website, www.audemarspiguet.com.  The Audemars Piguet Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

30.     Further, Audemars Piguet and related companies extensively use, advertise, and promote the Audemars Piguet Marks in the United States in connection with the sale of high quality goods.  As a result of these efforts, the Audemars Piguet Marks are widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as identifiers of high quality goods.

31.     Audemars Piguet has carefully monitored and policed the use of the Audemars Piguet Marks and has never assigned or licensed the Audemars Piguet Marks to any of the Defendants in this matter.

32.     Genuine goods bearing the Audemars Piguet Marks are widely legitimately advertised and promoted by Audemars Piguet and related companies, authorized distributors, and unrelated third parties via the Internet.  Over the course of the several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Audemars Piguet's overall marketing and consumer education efforts. Thus, Audemars Piguet and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Audemars Piguet and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Audemars Piguet Marks and the goods sold thereunder. Similarly, Defendants' individual seller stores, user accounts, and website are indexed on search engines and compete directly with Audemars Piguet for space in the search results.

**Longines' Rights**

33.     Longines is the owner of the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "Longines Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| LONGINES | 065,109 | September 10, 1907 | IC 014. Watches, parts of watches, and watchcases |
| LONGINES | 668,956 | October 28, 1958 | IC 014. Watches and watch movements and parts thereof |
| | 1,328,417 | April 2, 1985 | IC 014.  Clocks, Watches and Parts Therefor, and Jewelry and Costume Jewelry |
| LONGINES | 1,377,147 | January 7, 1986 | IC 014. Watches and parts therefor, and jewelry and costume jewelry. |

The Longines Marks are used in connection with the manufacture and distribution of high-quality goods in the category identified above. True and correct copies of the Certificates of Registration for the Longines Marks are attached hereto as Composite Exhibit "2."

34.     Long before the Defendants began their infringing activities complained of herein, the Longines Marks have been used by Longines in interstate commerce to identify and distinguish Longines' high quality goods for an extended period of time and serves as symbols of Longines' quality, reputation and goodwill.

35.     Longines expends substantial resources developing, advertising and otherwise promoting the Longines Marks. Longines and related companies have spent significant monetary resources to extensively advertise and promote products under the Longines Marks in magazines, newspapers, in stores, on the Internet and in other media worldwide, including the official Longines website, www.longines.com. The Longines Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

36.     Further, Longines extensively uses, advertises, and promotes the Longines Marks in the United States in connection with the sale of high quality goods. As a result, the Longines Marks are widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as identifiers of high quality goods.

37.     Longines has carefully monitored and policed the use of the Longines Marks and has never assigned or licensed the Longines Marks to any of the Defendants in this matter.

38.     Genuine goods bearing the Longines Marks are widely legitimately advertised and promoted by Longines and related companies, authorized distributors, and unrelated third parties via the Internet. Over the course of the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become

increasingly important to Longines' overall marketing and consumer education efforts.  Thus, Longines and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies.  Those strategies allow Longines and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Longines Marks and the goods sold thereunder. Similarly, Defendants' individual seller stores, user accounts, and website are indexed on search engines and compete directly with Longines for space in the search results.

**Patek Philippe's Rights**

39.     Henri Stern is the owner of the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "Patek Philippe Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| PATEK PHILIPPE | 520,291 | January 24, 1950 | IC 014 - watches. |
| PATEK PHILIPPE | 764,655 | February 11, 1964 | IC 014. Leather Straps for Wrist Watches |

The Patek Philippe Marks are used in connection with the manufacture and distribution of high quality goods in the category identified above. True and correct copies of the Certificates of Registration for the Patek Philippe Marks are attached hereto as Composite Exhibit "3."

40.     Long before the Defendants began their infringing activities complained of herein, the Patek Philippe Marks have been used in interstate commerce to identify and distinguish Patek Philippe's high quality  goods for an extended period of time and serve as symbols of Patek Philippe's quality, reputation and goodwill.

14

41.     Patek Philippe expends substantial resources developing, advertising and otherwise promoting the Patek Philippe Marks.  Patek Philippe has spent significant monetary resources to extensively advertise and promote products under the Patek Philippe Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Patek Philippe website, www.patek.com.  The Patek Philippe Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

42.     Further, Patek Philippe extensively uses, advertises, and promotes the Patek Philippe Marks in the United States in connection with the sale of high quality goods.  As a result of these efforts, the Patek Philippe Marks are widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as identifiers of high quality goods.

43.     Patek Philippe has carefully monitored and policed the use of the Patek Philippe Marks and has never assigned or licensed the Patek Philippe Marks to any of the Defendants in this matter.

44.     Genuine Patek Philippe branded goods are widely legitimately advertised and promoted by Patek Philippe, authorized distributors and unrelated third parties via the Internet. Over the course of the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Patek Philippe's overall marketing and consumer education efforts.  Thus, Patek Philippe expends significant monetary resources on Internet marketing and consumer education, including SEO strategies.  Those strategies allow Patek Philippe and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Patek Philippe Marks and the goods sold thereunder. Similarly, Defendants' individual seller stores, user accounts, and website

are indexed on search engines and compete directly with Patek Philippe for space in the search results.

**Hublot's Rights**

45.     Hublot is the owner of the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "Hublot Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| HUBLOT | 1,222,529 | January 4, 1983 | IC 014. Watches and Clocks and Parts Therefor; Chronometers; Chronographs; Costume Jewelry and Jewelry Made Wholly or in Part of Precious Metals |
| BIG BANG | 3,149,003 | September 26, 2006 | IC 014: Timepieces and chronometric instruments and parts thereof namely watch cases, watch bands, watches used as chronographs, watches used as chronoscopes, chronometers, watches, wristwatches, dress watches, diving watches, movements for clocks and watches, movements for watches |
|  | 3,715,561 | November 24, 2009 | IC 014: Jewellery; horological and chronometric instruments, namely, watches, wristwatches, watchbands, watch cases, dials, clocks, wall clocks, chronometers, chronographs |

The Hublot Marks are used in connection with the manufacture and distribution of high-quality goods in the category identified above.  True and correct copies of the Certificates of Registration for the Hublot Marks are attached hereto as Composite Exhibit "4."

46.     Long before the Defendants began their infringing activities complained of herein, the Hublot Marks have been used by Hublot in interstate commerce to identify and distinguish Hublot's high quality goods for an extended period of time and serves as symbols of Hublot's quality, reputation, and goodwill.

16

47.     Hublot and related companies expend substantial resources developing, advertising and otherwise promoting the Hublot Marks.  Hublot and related companies have spent significant monetary resources to extensively advertise and promote products under the Hublot Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Hublot website, www.hublot.com.  The Hublot Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

48.     Further, Hublot and related companies extensively use, advertise, and promote the Hublot Marks in the United States in connection with the sale of high quality goods.  As a result, the Hublot Marks are widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as identifiers of high quality goods.

49.     Hublot has carefully monitored and policed the use of the Hublot Marks and has never assigned or licensed the Hublot Marks to any of the Defendants in this matter.

50.     Genuine goods bearing the Hublot Marks are widely legitimately advertised and promoted by Hublot and related companies, authorized distributors, and unrelated third parties via the Internet.  Over the course of the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Hublot's overall marketing and consumer education efforts.  Thus, Hublot and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies.  Those strategies allow Hublot and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Hublot Marks and the goods sold thereunder. Similarly, Defendants' individual seller stores, user accounts, and website are indexed on search engines and compete directly with Hublot for space in the search results.

**LVMH'S Rights**

51.     LVMH is the owner of the following trademarks which are valid and registered

on the Principal Register of the United States Patent and Trademark Office (the "Tag Heuer

Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| FORMULA 1 | 1,435,463 | April 7, 1987 | IC 014. Mechanical watches, and their constituent parts. |
|  | 1,471,988 | January 12, 1988 | IC 009. Time measuring instruments, namely, electronic stop watches, remote control mini-printer timers, electronic and manual timers, photocell timers, starting gate timers, telephone liaison timers, impulse distributor timers, electronic pistol starting timers, manual contactor timers.<br>IC 014. Clocks, watches and parts thereof.<br>IC 025. Sportswear, namely, parkas. |
| TAG HEUER | 2,281,436 | September 28, 1999 | IC 014.Clocks, watches and parts thereof. |
| HEUER | 3569070 | February 3, 2009 | "IC 009. optical goods, namely, spectacles, sunglasses, spectacle frames, spectacles cases; time measuring apparatus and instruments, namely, electronic stop watches, remote control miniprinter timers, electronic and manual timers, photocell timers, starting gate timers, telephone liaison timers, impulse distributor timers, electronic pistol starting timers, manual contactor timers, calculators incorporating watch functions, electric time control switches and their parts; telephones, mobile phones, cameras, digital audio players and handheld mobile digital electronic devices for the sending and receiving of telephone calls, for use as a digital audio player, and for use as a camera; accessories for telephones, mobile phones and handheld mobile digital electronic devices, namely, cases, batteries, chargers, loudspeakers, microphones, stands, rests and frames. |

| TAG | 4,868,760 | December 15, 2015 | IC 014. Timepieces and chronometric instruments |
|---|---|---|---|
| TAG HEUER | 5,202,283 | May 16, 2017 | IC 003. soaps; perfumes; cosmetics, creams, and lotions for the body and hair; shampoos; makeup and makeup removers; lipstick; beauty masks; shaving preparations; after-shave lotions and balms; non-medicated toiletries; deodorants for personal use; leather polishes; preservative creams for leather<br>IC 009. apparatus for recording, transmission, reproduction, or processing of sound or images; electronic timers and timing sensors; calculating machines; equipment for data processing; timing dials and timing sensors; electronic timers; chronographs for use as specialized time recording apparatus; game software; computer operating software for smartwatches and mobile electronic devices; computer software for sending and receiving electronic mail, text messages, data, photographs, and videos; computer software for accessing, browsing, and searching online databases; computer software for sensing, monitoring, recording, displaying, measuring, and transmitting global positioning, direction, distance, altitude, speed, navigational information, weather information, temperature, physical activity level, heart rate, pulse rate, blood pressure, calories burned, steps taken, and biometric data; computer software for tracking and managing information regarding health, fitness, and wellness programs; computer peripherals; telephones; tablet computers; MP3 players; smartwatches; wearable computers; smartphones featuring a watch; accessories for computers, telephones, tablet computers, MP3 players, and smartwatches, namely, displays, monitors, protective covers, carrying cases, stands, batteries, battery chargers, headphones, speakers, headsets, microphones, car audio adapters, remote controls, connection cables, power adapters, docking stations, and adapter plugs; spectacles; sunglasses; optical lenses and glasses; spectacle cases; memory cards and integrated circuit cards; downloadable electronic publications in the nature of books, newsletters, catalogs, and brochures in the fields of watches, chronometric instruments, jewelry, apparel, |

luggage, leather accessories, personal care products, luxury goods, sports, and fashion; electronic sensors, monitors, and displays used to provide and display official time at sporting, cultural, wellness, entertainment, and educational events; electronic connected bracelets and connected cuffs for tracking the movement of people that also have a function of transmitting, and/or receiving data to and/or from personal digital assistants, tablets, smart phones and personal computers through internet websites and other computer and electronic communication networks.

IC 014.  jewelry; precious stones; horological instruments, namely, watches, wristwatches, and constitutive parts therefor; alarm clocks, clocks and other chronometric instruments, chronometers, chronographs as watches, chronometric apparatus for sports timing, chronometric apparatus for measuring and marking the time; watch bands, watch chains, watch springs, watch dials or watch glasses, watch winders, watch cases being parts of watches, cases and boxes adapted for holding watches; precious metals and their alloys; jewelry cases; boxes of precious metal; key rings, trinkets or fobs of precious metals; cuff links; bracelets; rings; medals; watches that also have a function of transmitting and/or receiving data to and/or from personal digital assistants, tablets, smart phones and personal computers through internet websites and other computer and electronic communication networks; watches containing an electronic game function, watches incorporating a telecommunication function; leather boxes adapted for holding watches

IC 016. passport holders and cases

IC 018. goods of leather and imitation leather, namely, leather or leatherboard boxes, leather or imitation leather envelopes, travel chests, bags, garment bags for travel, trunks, suitcases, luggage, carrying boxes intended for toiletry articles sold empty, rucksacks, handbags, beach bags, reusable shopping bags, shoulder bags, carrying cases, attaché cases, briefcases, school satchels, under-arm bags, wallets, purses, money pouches, key

| | | | cases, credit card holders; umbrellas, parasols, sun umbrellas, walking sticks<br>IC 025. clothing, namely, underwear, sweaters, shirts, bodices, corsets, suits, vests, raincoats, skirts, coats, trousers, jumpers, dresses, jackets, shawls, sashes for wear, scarves, neckties, pocket squares, suspenders, gloves, belts, stockings, tights, socks, singlets, bathing suits and bathrobes; footwear; headwear<br>IC 035. retail store services and online retail store services featuring cosmetics, hair care and skin care preparations, perfumes, shaving preparations, toiletries, smartwatches, computers, tablet computers, computer hardware, computer software, computer peripherals, telephones, mobile electronic devices, health, fitness and exercise sensors, monitors and displays, computer gaming machines and electronic games, and accessories for computers, telephones, and mobile electronic devices, sunglasses, spectacles, optical lenses and glasses, spectacle cases, jewelry and precious stones, watches, clocks, chronometric instruments, accessories for watches and chronometric instruments, leather goods, leatherware, bags, briefcases, luggage, wallets, purses, umbrellas, clothing, footwear, and headgear; public relations; advertising services for luxury products, namely, cosmetics, perfumes, optical goods, telephones, wearable electronic devices, jewelry, horological products, watches, connected watches, smartwatches, luggage, leatherware, bags, clothing, clothing accessories; business management and organization consultancy in the field of luxury goods |
|---|---|---|---|
| TAG HEUER | 5,314,173 | August 8, 2017 | IC 003. soaps; perfumes; cosmetics, creams, and lotions for the body and hair; shampoos; makeup and makeup removers; lipstick; beauty masks; shaving preparations; after-shave lotions and balms; non-medicated toiletries; deodorants for personal use; leather polishes; preservative creams for leather.<br>IC 009. apparatus for recording, transmission, reproduction, or processing of sound or images; electronic timers and timing sensors; calculating machines; equipment for data processing; timing dials and timing sensors; electronic timers; |

|  |  |  | chronographs for use as specialized time recording apparatus; game software; computer operating software for smartwatches and mobile electronic devices; computer software for sending and receiving electronic mail, text messages, data, photographs, and videos; computer software for accessing, browsing, and searching online databases; computer software for sensing, monitoring, recording, displaying, measuring, and transmitting global positioning, direction, distance, altitude, speed, navigational information, weather information, temperature, physical activity level, heart rate, pulse rate, blood pressure, calories burned, steps taken, and biometric data; computer software for tracking and managing information regarding health, fitness, and wellness programs; computer peripherals; telephones; tablet computers; MP3 players; smartwatches; wearable computers; smartphones featuring a watch; accessories for computers, telephones, tablet computers, MP3 players, and smartwatches, namely, displays, monitors, protective covers, carrying cases, stands, batteries, battery chargers, headphones, speakers, headsets, microphones, car audio adapters, remote controls, connection cables, power adapters, docking stations, and adapter plugs; spectacles; sunglasses; optical lenses and glasses; spectacle cases; memory cards and integrated circuit cards; downloadable electronic publications in the nature of books, newsletters, catalogs, and brochures in the fields of watches, chronometric instruments, jewelry, apparel, luggage, leather accessories, personal care products, luxury goods, sports, and fashion; electronic sensors, monitors, and displays used to provide and display official time at sporting, cultural, wellness, entertainment, and educational events; electronic connected bracelets and connected cuffs for tracking the movement of people that also have a function of transmitting, and/or receiving data to and/or from personal digital assistants, tablets, smart phones and personal computers through internet websites and other computer and electronic communication networks. |
|---|---|---|---|

|  |  |  | IC 010. health monitoring devices consisting of health, fitness and exercise sensors, heart rate monitors and sensors, pulse rate monitors and sensors, blood pressure monitors and sensors, respiratory monitors and sensors, thermometers, pedometers and monitors and displays for medical use to be worn during exercise and sporting activities.<br><br>IC 014. jewelry; precious stones; horological instruments, namely, watches, wristwatches, and constitutive parts therefor; alarm clocks, clocks and other chronometric instruments, chronometers, chronographs as watches, chronometric apparatus for sports timing, chronometric apparatus for measuring and marking the time; watch bands, watch chains, watch springs, watch dials or watch glasses, watch winders, watch cases being parts of watches, cases and boxes adapted for holding watches; precious metals and their alloys; jewelry cases; boxes of precious metal; key rings trinkets or fobs of precious metals; cuff links; bracelets; rings; medals; watches that also have a function of transmitting and/or receiving data to and/or from personal digital assistants, tablets, smart phones and personal computers through internet websites and other computer and electronic communication networks; watches containing an electronic game function, watches incorporating a telecommunication function; leather boxes adapted for holding watches.<br><br>IC 028. computer gaming machines; electronic games other than those adapted for use with television receivers only.<br><br>IC 035. retail store services and online retail store services featuring cosmetics, hair care and skin care preparations, perfumes, shaving preparations, toiletries, smartwatches, computers, tablet computers, computer hardware, computer software, computer peripherals, telephones, mobile electronic devices, health, fitness and exercise sensors, monitors and displays, computer gaming machines and electronic games, and accessories for computers, telephones, and mobile electronic devices, sunglasses, spectacles, optical lenses and glasses, spectacle cases, jewelry and precious stones, watches, clocks, chronometric instruments, |
|---|---|---|---|

| | | | accessories for watches and chronometric instruments, leather goods, leatherware, bags, briefcases, luggage, wallets, purses, umbrellas, clothing, footwear, and headgear; public relations; advertising services for luxury products, namely, cosmetics, perfumes, optical goods, telephones, wearable electronic devices, jewelry, horological products, watches, connected watches, smartwatches, luggage, leatherware, bags, clothing, clothing accessories; business management and organization consultancy in the field of luxury goods. IC 037. repair, overhaul repair, maintenance and polishing of portable/wearable electronic and/or telecommunication devices; repair, overhaul repair, maintenance and polishing of timepieces. IC 038. telecommunications services, namely, personal communication services, ISDN services, telecommunications access services, data transmission and reception services via telecommunication means, and telecommunications gateway services; telecommunication information; communications by computer terminals or by fiber-optic networks; electronic bulletin board services. IC 041. providing information about sporting and cultural activities, fitness, exercise, sports, entertainment, education and training exercise; timing of sports events. IC 044. health assessment services; providing medical information in the fields of health, fitness, and exercise |
|---|---|---|---|

The Tag Heuer Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above.  True and correct copies of the Certificates of Registration for the Tag Heuer Marks are attached hereto as Composite Exhibit "5."

52.     Long before the Defendants began their infringing activities complained of herein, the Tag Heuer Marks have been used by LVMH in interstate commerce to identify and distinguish LVMH's high-quality goods for an extended period of time and serve as symbols of LVMH's quality, reputation and goodwill.

24

53.     LVMH and related companies expend substantial resources developing, advertising and otherwise promoting the Tag Heuer Marks. LVMH and related companies have spent significant monetary resources to extensively advertise and promote products under the Tag Heuer Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Tag Heuer website, www.tagheuer.com.  The Tag Heuer Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

54.     Further, LVMH and related companies extensively use, advertise, and promote the Tag Heuer Marks in the United States in connection with the sale of high quality goods.  As a result, the Tag Heuer Marks are widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as identifiers of high quality goods.

55.     LVMH has carefully monitored and policed the use of the Tag Heuer Marks and has never assigned or licensed the Tag Heuer Marks to any of the Defendants in this matter.

56.     Genuine goods bearing the Tag Heuer Marks are widely legitimately advertised and promoted by LVMH and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to LVMH's overall marketing and consumer education efforts. Thus, LVMH and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow LVMH and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Tag Heuer Marks and the goods sold thereunder. Similarly, Defendants' individual seller stores, user accounts, and website are indexed on search engines and compete directly with LVMH for space in the search results.

**Movado's Rights**

57.    Movado is the owner of the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "Movado Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| MOVADO | 1,294,171 | September 11, 1984 | IC 014. Watches and Parts Therefor |
|  | 1,381,257 | February 4, 1986 | IC 014. Watches |
| MOVADO | 3785542 | May 4, 2010 | IC 014. Horological and chronometric instruments. |

The Movado Marks are used in connection with the manufacture and distribution of high-quality goods in the category identified above.  True and correct copies of the Certificates of Registration for the Movado Marks are attached hereto as Composite Exhibit "6."

58.    Long before the Defendants began their infringing activities complained of herein, the Movado Marks have been used Movado in interstate commerce to identify and distinguish Movado's high quality goods for an extended period of time and serve as symbols of Movado's quality, reputation and goodwill.

59.    Movado and related companies expend substantial resources developing, advertising and otherwise promoting the Movado Marks.  Movado and related companies have spent significant monetary resources to extensively advertise and promote products under the Movado Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Movado website, www.movado.com.  The Movado Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

26

60.     Further, Movado and related companies extensively use, advertise, and promote the Movado Marks in the United States in connection with the sale of high quality goods.  As a result of these efforts, the Movado Marks are widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as identifiers of high quality goods.

61.     Movado has carefully monitored and policed the use of the Movado Marks and has never assigned or licensed the Movado Marks to any of the Defendants in this matter.

62.      Genuine goods bearing the Movado Marks are widely legitimately advertised and promoted by Movado and related companies, authorized distributors, and unrelated third parties via the Internet.  Over the course of the several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Movado's overall marketing and consumer education efforts. Thus, Movado and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Movado and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Movado Marks and the goods sold thereunder. Similarly, Defendants' individual seller stores, user accounts, and website are indexed on search engines and compete directly with Movado for space in the search results.

**Omega's Rights**

63.     Omega is the owner of the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "Omega Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| Ω OMEGA | 25,036 | July 24, 1894 | IC 014. Watch movements and watch cases |

| SEAMASTER | 556,602 | March 25, 1952 | IC 014. Watches, watch parts and watch movements. |
|---|---|---|---|
| **OMEGA** | 566,370 | November 4, 1952 | IC 014. Watches and parts thereof. |
| Ω OMEGA | 578,041 | July 28, 1953 | IC 014. watches (including pocket watches, wrist watches with or without straps, bands or bracelets, pendant watches, calendar watches, and stopwatches) either stem-wind or automatic; clocks; chronometers, chronographs, and parts for all of the foregoing. |
| SPEEDMASTER | 672,487 | January 13, 1959 | IC 014. Watches and clocks. |
| Ω | 734,891 | July 24, 1962 | IC 014. Timepieces and Parts Thereof. |
| Ω OMEGA | 1,290,661 | August 21, 1984 | IC 014. Watch Cases [ , Watch Chains, and Watch Stands Sold as a Unit with Watches ] |
| PLANET OCEAN | 3,085,659 | April 25, 2006 | IC 014. Watches and watch parts. |
| BROAD ARROW | 3,418,186 | April 29, 2008 | IC 014. Watches, [ watch straps, watch bracelets and parts thereof; ] chronometers, chronographs, watches made of precious metals, watches partly or entirely set with precious stones. |
| SEAMASTER | 3,640,080 | June 16, 2009 | IC 014. Jewelry, [ precious stones; ] horological and chronometrical instruments. |
|  | 3,757,932 | March 9, 2010 | IC 014. [jewelry and precious stones;] horological and chronometric instruments. |
| AQUA TERRA | 4,299,644 | March 12, 2013 | IC 014. Watches, watch straps, watch bracelets and parts thereof, chronometers, chronographs for use as watches, watches made of precious metals, watches partly or entirely set with precious stones. |
| CO-AXIAL | 4,442,192 | December 3, 2013 | IC 014. Horological and chronometric instruments. |
| DARK SIDE OF THE MOON | 4,735,993 | May 12, 2015 | IC 014. Horological and chronometric instruments. |

28

| | | | |
|---|---|---|---|
| Ω OMEGA | 5,094,915 | December 6, 2016 | IC 014. Horological and chronometric instruments and parts for the aforesaid goods; accessories namely, watch chains, presentation cases for watches and cases for watches. |
| CO-AXIAL MASTER CHRONOMETER | 5,266,563 | August 15, 2017 | IC 014. horological and chronometric instruments |

The Omega Marks are used in connection with the manufacture and distribution of high-quality

goods in the category identified above.  True and correct copies of the Certificates of

Registration for the Omega Marks are attached hereto as Composite Exhibit "7."

64.     Long before the Defendants began their infringing activities complained of

herein, the Omega Marks have been used by Omega in interstate commerce to identify and

distinguish Omega's high quality goods for an extended period of time and serves as a symbol of

Omega's quality, reputation and goodwill.

65.     Omega expends substantial resources developing, advertising and otherwise

promoting the Omega Mark.  Omega and related companies have spent significant monetary

resources to extensively advertise and promote products under the Omega Marks in magazines,

newspapers, on the Internet and in other media worldwide, including the official Omega website,

www.omegawatches.com. The Omega Marks qualify as famous marks as that term is used in 15

U.S.C. §1125(c)(1).

66.     Further, Omega extensively uses, advertises, and promotes the Omega Marks in

the United States in connection with the sale of high quality goods.  As a result, the Omega

Marks are widely recognized trademarks in the United States, and the trademarks have achieved

secondary meaning as identifiers of high quality goods.

67.     Omega has carefully monitored and policed the use of the Omega Marks and has

never assigned or licensed the Omega Marks to any of the Defendants in this matter.

68.     Genuine goods bearing the Omega Marks are widely legitimately advertised and promoted by Omega and related companies, authorized distributors, and unrelated third parties via the Internet.  Over the course of the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Omega's overall marketing and consumer education efforts.  Thus, Omega and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies.  Those strategies allow Omega and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Omega Marks and the goods sold thereunder. Similarly, Defendants' individual seller stores, user accounts, and website are indexed on search engines and compete directly with Omega for space in the search results.

**Pamp's Rights**

69.     Pamp is the owner of the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "Pamp Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| PAMP | 1,477,592 | February 23, 1988 | IC 014.  [ articles of jewelry, namely, rings, bracelets, earrings, cuff links, brooches, chains, necklaces, medals; jewelry; time pieces, namely, stop watches, clocks, alarm clocks; ] precious and semi-precious metal and their alloys in [ bands, ] bars, [ leaves, threads, ] ingots, [ sheets, dust, ribbons and tubes; and coins ] |
|  | 1,503,810 | September 13, 1988 | IC 014.  jewelry in precious metals; precious metals and their alloys in the form of ingots, medals [ *bands* ] and bars |
|  | 1,597,361 | May 22, 1990 | IC 014. articles of jewelry, small ingots of precious metal, precious metal sold in bulk, medallions and non-monetary coins made of precious metal |

| | | | |
|---|---|---|---|
| **VERISCAN** | 4,545,646 | June 10, 2014 | IC 009. Apparatus for checking the authenticity of precious metals; * equipment for the authentication of goods of metal and documents relating thereto and * currency authentication apparatus [ and equipment for capturing the surface signature of documents and products in precious metal by optical surface authentication technology; ] scanners for computing; pattern recognition systems [ consisting ] * composed * of computer chips, computer hardware and software for [ use as a spreadsheet, word processing or in database management for converting data into digital ID ] * authenticating goods of metal and documents relating thereto *<br>IC 035. [ Computer data gathering services, namely, compilation of data for business purposes; ] compilation of information in computer databases; compilation of information into computer databases *, all the aforesaid services relating to the examination, production, refining, certification and authentication of goods of metal and for the authentication and certification of physical documents relating thereto, including cash and passports; computer data gathering services *<br>IC 042. Ingot authentication and certification, namely, testing, analysis and evaluation of the ingots of others for the purpose of certification; computer authorization, namely, software authoring, design and implementation of software and technology solutions for the purpose of precious metals and currency products and document authentication and tracking, and brand monitoring and protection, to protect against counterfeiting, tampering, and diversion, and to ensure the integrity of genuine products and documents; computer authentication, namely, electronic document and email authentication services; data encryption and decoding services; digital certificate services, namely, authentication, issuance and validation of digital certificates; digitization of documents, namely, electronic scanning of |

| | | | |
|---|---|---|---|
| | | | official documents, identity card, passport; computer data recovery; electronic data backup, namely, backup services for computer hard drive data; computer data security services, namely, enforcing, restricting and controlling access privileges of users of computing resources for cloud, mobile or network resources based on assigned credentials * ; all the aforesaid services in connection with the examination, production, refining, certification and authentication of goods of metal and for the authentication and certification of physical documents relating thereto, including cash and passports * IC 045. Authentication of personal identification information; identification and verification services, namely, the provision of authentication of personal identification information *, all the aforesaid services in connection with the authentication of passports * ; assignment of identification numbers to affix to valuables to facilitate recovery in the event of loss or theft; automated fraud detection services in the field of the authentication of items made of precious metal |
| LADY FORTUNA | 5,343,249 | November 28, 2017 | IC 014. Precious metals and their alloys and goods made of these materials or coated therewith not included in other classes, namely, key rings, name plates of precious metal, boxes of precious metal, presentation boxes for watches; jewelry, precious stones; timepieces and chronometric instruments; jewelry ornaments; jewelry rings; jewelry bracelets; earrings; cuff links; jewelry broaches; jewelry chains; jewelry necklaces; medals; charms; pendants; apparatus and instruments for measuring and marking time, not included in other classes, namely, watch bezels, watch dials, watch crown, watch hands, watch rotors; chronometers; clocks; watches; alarm clocks; unwrought or semi-wrought precious metals; alloys of precious metal; ingots of precious metals; gold thread jewelry; silver thread jewelry; jewelry threads of precious metal; spun silver; coins, namely |

| | | | souvenir coins, collectible coins, commemorative coins, non-monetary coins |
|---|---|---|---|

The Pamp Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above.  True and correct copies of the Certificates of Registration for the Pamp Marks are attached hereto as Composite Exhibit "8."

70.     Long before the Defendants began their infringing activities complained of herein, the Pamp Marks have been used Pamp in interstate commerce to identify and distinguish Pamp's high quality goods for an extended period of time and serve as symbols of Pamp's quality, reputation and goodwill.

71.     Pamp and related companies expend substantial resources developing, advertising and otherwise promoting the Pamp Marks.  Pamp and related companies have spent significant monetary resources to extensively advertise and promote products under the Pamp Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Pamp website, www.pamp.com.  The Pamp Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

72.     Further, Pamp and related companies extensively use, advertise, and promote the Pamp Marks in the United States in connection with the sale of high quality goods.  As a result of these efforts, the Pamp Marks are widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as identifiers of high quality goods.

73.     Pamp has carefully monitored and policed the use of the Pamp Marks and has never assigned or licensed the Pamp Marks to any of the Defendants in this matter.

74.     Genuine goods bearing the Pamp Marks are widely legitimately advertised and promoted by Pamp and related companies, authorized distributors, and unrelated third parties via the Internet.  Over the course of the several years, visibility on the Internet, particularly via

Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Pamp's overall marketing and consumer education efforts. Thus, Pamp and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Pamp and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Pamp Marks and the goods sold thereunder. Similarly, Defendants' individual seller stores, user accounts, and website are indexed on search engines and compete directly with Pamp for space in the search results.

**Tissot's Rights**

75.     Tissot is the owner of the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "Tissot Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| **TISSOT** | 1,639,684 | April 2, 1991 | IC 014. watches; parts, fittings and fixtures for watches |
| Ⓣ | 4,900,255 | February 16, 2016 | IC 014. Horological and chronometric instruments. |
| **T** | 4,971,556 | June 7, 2016 | IC 014. Horological and chronometric instruments. |

The Tissot Marks are used in connection with the manufacture and distribution of high-quality goods in the category identified above.  True and correct copies of the Certificates of Registration for the Tissot Marks are attached hereto as Composite Exhibit "9."

76.     Long before the Defendants began their infringing activities complained of herein, the Tissot Marks have been used by Tissot in interstate commerce to identify and distinguish Tissot's high quality goods for an extended period of time and serves as symbols of Tissot's quality, reputation and goodwill.

34

77.     Tissot expends substantial resources developing, advertising and otherwise promoting the Tissot Marks.  Tissot and related companies have spent significant monetary resources to extensively advertise and promote products under the Tissot Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Tissot website, www.tissotwatches.com.  The Tissot Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

78.     Further, Tissot extensively uses, advertises, and promotes the Tissot Marks in the United States in connection with the sale of high quality goods.  As a result, the Tissot Marks are widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as identifiers of high quality goods.

79.     Tissot has carefully monitored and policed the use of the Tissot Marks and has never assigned or licensed the Tissot Marks to any of the Defendants in this matter.

80.     Genuine goods bearing the Tissot Marks are widely legitimately advertised and promoted by Tissot and related companies, authorized distributors, and unrelated third parties via the Internet.  Over the course of the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Tissot's overall marketing and consumer education efforts.  Thus, Tissot and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies.  Those strategies allow Tissot and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Tissot Marks and the goods sold thereunder. Similarly, Defendants' individual seller stores, user accounts, and website are indexed on search engines and compete directly with Tissot for space in the search results

**Turlen's Rights**

81.    Turlen is the owner of the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "Richard Mille Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| RICHARD MILLE | 3,117,381 | July 18, 2006 | IC 014. horological and chronometric instruments |

The Richard Mille Mark is used in connection with the manufacture and distribution of high-quality goods in the category identified above. A true and correct copy of the Certificate of Registration for the Richard Mille Mark is attached hereto as Composite Exhibit "10."

82.    Long before the Defendants began their infringing activities complained of herein, the Richard Mille Mark has been used by Turlen in interstate commerce to identify and distinguish Turlen's high quality goods for an extended period of time and serves as a symbol of Turlen's quality, reputation and goodwill.

83.    Turlen and related companies expend substantial resources developing, advertising and otherwise promoting the Richard Mille Mark.  Turlen and related companies have spent significant monetary resources to extensively advertise and promote products under the Richard Mille Mark in magazines, newspapers, on the Internet and in other media worldwide, including the official Richard Mille website, www.richardmille.com.  The Richard Mille Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

84.    Further, Turlen and related companies extensively use, advertise, and promote the Richard Mille Mark in the United States in connection with the sale of high quality goods.  As a

36

result, the Richard Mille Mark is widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

85.     Turlen has carefully monitored and policed the use of the Richard Mille Mark and has never assigned or licensed the Richard Mille Mark to any of the Defendants in this matter.

86.     Genuine goods bearing the Richard Mille Mark are widely legitimately advertised and promoted by Turlen and related companies, authorized distributors, and unrelated third parties via the Internet.  Over the course of the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Turlen's overall marketing and consumer education efforts.  Thus, Turlen and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies.  Those strategies allow Turlen and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Richard Mille Mark and the goods sold thereunder. Similarly, Defendants' individual seller stores, user accounts, and website are indexed on search engines and compete directly with Turlen for space in the search results.

### **Defendants' Infringing Activities**

87.     Defendants are promoting and advertising, distributing, selling and/or offering for sale goods in interstate commerce bearing counterfeits and confusingly similar imitations of one or more of the Audemars Piguet Marks, Longines Marks, Patek Philippe Marks, Hublot Marks, Tag Heuer Marks, Movado Marks, Omega Marks, Pamp Marks, Tissot Marks, and/or Richard Mille Mark (the "Counterfeit Goods") via the Internet based e-commerce stores, social media accounts, and/or website operating under at least the Seller IDs and Subject Domain Name. Specifically, Defendants are using the Audemars Piguet Marks, Longines Marks, Patek Philippe

Marks, Hublot Marks, Tag Heuer Marks, Movado Marks, Omega Marks, Pamp Marks, Tissot Marks, and/or Richard Mille Mark (collectively, "Plaintiffs' Marks") to initially attract online consumers and drive them to Defendants' e-commerce stores operating under the Seller IDs and Subject Domain Name. Defendants are using identical copies of one or more Plaintiffs' Marks for different quality goods. Plaintiffs have used their respective Marks extensively and continuously before Defendants began offering counterfeit and confusingly similar imitations of Plaintiffs' goods.

88.    Defendants' Counterfeit Goods are of a quality substantially different than that of Plaintiffs' genuine goods. Defendants are actively using, promoting and otherwise advertising, distributing, selling and/or offering for sale substantial quantities of their Counterfeit Goods with the knowledge and intent that such goods will be mistaken for the genuine high quality goods offered for sale by Plaintiffs despite Defendants' knowledge that they are without authority to use Plaintiffs' Marks. The net effect of Defendants' actions is likely to cause confusion of consumers at the time of initial interest, sale, and in the post-sale setting, who will believe all of Defendants' goods offered for sale in Defendants' e-commerce stores and website are genuine goods originating from, associated with, and/or approved by Plaintiffs.

89.    Defendants advertise their e-commerce stores, social media accounts, and website, including their Counterfeit Goods offered for sale to the consuming public via at least their e-commerce stores, social media accounts, and website operating under the Seller IDs and Subject Domain Name. In so advertising these stores and goods, Defendants improperly and unlawfully use one or more of Plaintiffs' Marks without Plaintiffs' permission.

90.    As part of their overall counterfeiting and infringement scheme, Defendants are, upon information and belief, concurrently employing and benefitting from substantially similar,

advertising and marketing strategies based, in large measure, upon an illegal use of counterfeits and infringements of one or more of Plaintiffs' Marks.  Specifically, Defendants are using counterfeits and infringements of one or more of Plaintiffs' Marks in order to make their e-commerce stores, social media accounts, and website selling illegal goods appear more relevant and attractive to consumers searching for both Plaintiffs' and non-Plaintiffs' goods and information online.  By their actions, Defendants are contributing to the creation and maintenance of an illegal marketplace operating in parallel to the legitimate marketplace for Plaintiffs' genuine goods.  Defendants are causing individual, concurrent and indivisible harm to Plaintiffs and the consuming public by (i) depriving Plaintiffs of their right to fairly compete for space online and within search engine results and reducing the visibility of Plaintiffs' genuine goods on the World Wide Web, (ii) causing an overall degradation of the value of the goodwill associated with Plaintiffs' Marks, and (iii) increasing Plaintiffs' overall cost to market their goods and educate consumers about their brands via the Internet.

91.     Defendants are concurrently conducting and targeting their counterfeiting and infringing activities toward consumers and likely causing unified harm within this district and elsewhere throughout the United States.  As a result, Defendants are defrauding Plaintiffs and the consuming public for Defendants' own benefit.

92.     At all times relevant hereto, Defendants in this action had full knowledge of Plaintiffs' respective ownership of Plaintiffs' Marks, including their respective, exclusive rights to use and license such intellectual property and the goodwill associated therewith.

93.     Defendants' use of Plaintiffs' Marks, including the promotion and advertisement, reproduction, distribution, sale and offering for sale of their Counterfeit Goods, is without Plaintiffs' consent or authorization.

94.     Defendants are engaging in the above-described illegal counterfeiting and infringing activities knowingly and intentionally or with reckless disregard or willful blindness to Plaintiffs' rights for the purpose of trading on Plaintiffs' respective goodwill and reputations.  If Defendants' intentional counterfeiting and infringing activities are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed.

95.     Defendants' above identified infringing activities are likely to cause confusion, deception and mistake in the minds of consumers before, during, and after the time of purchase. Moreover, Defendants' wrongful conduct is likely to create a false impression and deceive customers, the public, and the trade into believing there is a connection or association between Plaintiffs' genuine goods and Defendants' Counterfeit Goods, which there is not.

96.     Given the visibility of Defendants' various e-commerce stores and websites and the similarity of their actions, it is clear Defendants are either affiliated, or at a minimum, cannot help but know of each other's existence and the unified harm likely to be caused to Plaintiffs and the overall consumer market in which they operate as a result of Defendants' concurrent actions

97.     Although some Defendants may be physically acting independently, they may properly be deemed to be acting in concert because the combined force of their actions serves to multiply the harm caused to Plaintiffs.

98.     Defendants' payment and financial accounts are being used by Defendants to accept, receive, and deposit profits from Defendants' trademark counterfeiting and infringing and unfairly competitive activities connected to their Seller IDs and Subject Domain Name and any other alias seller identification names or domain names being used and/or controlled by them.

40

99.     Further, Defendants are likely to transfer or secret their assets to avoid payment of any monetary judgment awarded to Plaintiffs.

100.    Plaintiffs have no adequate remedy at law.

101.    Plaintiffs are suffering irreparable injury and have suffered substantial damages as a result of Defendants' unauthorized and wrongful use of Plaintiffs' Marks.  If Defendants' counterfeiting and infringing and unfairly competitive activities are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed.

102.    The harm and damages sustained by Plaintiffs have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offers to sell, and sale of their Counterfeit Goods.

## COUNT I - TRADEMARK COUNTERFEITING AND INFRINGEMENT PURSUANT TO § 32 OF THE LANHAM ACT (15 U.S.C. § 1114)

103.    Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 102 above.

104.    This is an action for trademark counterfeiting and infringement against Defendants based on their use of counterfeit and confusingly similar imitations of Plaintiffs' Marks in commerce in connection with the promotion, advertisement, distribution, offering for sale, and/or sale of the Counterfeit Goods.

105.    Specifically, Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing goods using counterfeits and/or infringements of one or more of Plaintiffs' Marks.  Defendants are continuously infringing and inducing others to infringe Plaintiffs' Marks by using one or more of Plaintiffs' Marks to advertise, promote, offer to sell, and/or sell counterfeit and infringing versions of Plaintiffs' branded goods.

41

106.    Defendants' concurrent counterfeiting and infringing activities are likely to cause and actually are causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' Counterfeit Goods.

107.    Defendants' unlawful actions have caused and are continuing to cause unquantifiable damages to Plaintiffs and are unjustly enriching Defendants with profits at Plaintiffs' expense.

108.    Defendants' above-described illegal actions constitute counterfeiting and infringement of Plaintiffs' Marks in violation of Plaintiffs' rights under § 32 of the Lanham Act, 15 U.S.C. § 1114.

109.    Plaintiffs have each suffered and will continue to suffer irreparable injury and damages due to Defendants' above described activities if Defendants are not preliminarily and permanently enjoined.  Additionally, Defendants will continue to wrongfully profit from their illegal activities.

### COUNT II - FALSE DESIGNATION OF ORIGIN
### PURSUANT TO § 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a))

110.    Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 102 above.

111.    Defendants' Counterfeit Goods bearing, offered for sale, and sold using copies of one or more of Plaintiffs' Marks have been widely advertised and offered for sale throughout the United States via the Internet.

112.    Defendants' Counterfeit Goods bearing, offered for sale and sold using copies of one or more of Plaintiffs' Marks are virtually identical in appearance to Plaintiffs' respective, genuine goods.  However, Defendants' Counterfeit Goods are different in quality.  Accordingly,

Defendants' activities are likely to cause confusion in the trade and among the general public as to at least the origin or sponsorship of their Counterfeit Goods.

113.    Defendants have used in connection with their advertisement, offer for sale, and sale of the Counterfeit Goods, false designations of origin and false descriptions and representations, including words or other symbols and trade dress which tend to falsely describe or represent such goods and have caused such goods to enter into commerce with full knowledge of the falsity of such designations of origin and such descriptions and representations, all to Plaintiffs' detriment.

114.    Defendants have authorized infringing uses of one or more of Plaintiffs' Marks in Defendants' advertisement and promotion of their counterfeit and infringing branded goods. Some Defendants have also misrepresented to members of the consuming public that the Counterfeit Goods being advertised and sold by them are genuine, non-infringing goods.

115.    Additionally, many Defendants are using counterfeits and infringements of one or more of Plaintiffs' Marks in order to unfairly compete with Plaintiffs and others for space within organic search engine and social media results, thereby jointly depriving Plaintiffs of a valuable marketing and educational tool which would otherwise be available to Plaintiffs and reducing the visibility of Plaintiffs' genuine goods on the World Wide Web and across social media platforms.

116.    Defendants' above-described actions are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

117.    Plaintiffs have no adequate remedy at law and have each sustained indivisible injury and damage caused by Defendants' concurrent conduct.  Absent an entry of an injunction by this Court, Defendants will continue to wrongfully reap profits and each Plaintiff will

continue to suffer irreparable injury to their goodwill and business reputations, as well as monetary damages.

## COUNT III - COMMON LAW UNFAIR COMPETITION

118.    Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 102 above.

119.    This is an action against Defendants based on their promotion, advertisement, distribution, sale, and/or offering for sale of goods using or bearing marks which are virtually identical to one or more of Plaintiffs' Marks, in violation of Florida's common law of unfair competition.

120.    Specifically, Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing infringing and counterfeit versions of Plaintiffs' branded goods.  Defendants are also using counterfeits and infringements of one or more of Plaintiffs' Marks to unfairly compete with Plaintiffs and others for (i) space in search engine and social media results across an array of search terms and (ii) visibility on the World Wide Web.

121.    Defendants' infringing activities are likely to cause and actually are causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' e-commerce stores as a whole and all products sold therein by their use of Plaintiffs' Marks.

122.    Plaintiffs have no adequate remedy at law and are suffering irreparable injury and damage as a result of Defendants' actions.

## COUNT IV - COMMON LAW TRADEMARK INFRINGEMENT

123.    Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 102 above.

124.     This is an action for common law trademark infringement against Defendants based on their promotion, advertisement, offering for sale, and/or sale of their Counterfeit Goods bearing one or more of Plaintiffs' Marks.  Plaintiffs are the owners of all common law rights in and to Plaintiffs' Marks.

125.     Specifically, Defendants are promoting and otherwise advertising, distributing, offering for sale, and selling goods using and bearing infringements of one or more of Plaintiffs' Marks.

126.     Defendants' infringing activities are likely to cause and actually are causing confusion, mistake and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' Counterfeit Goods bearing Plaintiffs' Marks.

127.     Plaintiffs have no adequate remedy at law and are suffering damages and irreparable injury as a result of Defendants' actions.

## PRAYER FOR RELIEF

128.     WHEREFORE, Plaintiffs demand judgment on all Counts of this Complaint and an award of equitable relief and monetary relief against Defendants as follows:

a.     Entry of a temporary restraining order, as well as preliminary and permanent injunctions pursuant to 15 U.S.C. § 1116 and Federal Rule of Civil Procedure 65 enjoining Defendants, their agents, representatives, servants, employees, and all those acting in concert or participation therewith, from manufacturing or causing to be manufactured, importing, advertising or promoting, distributing, selling or offering to sell their Counterfeit Goods; from infringing, counterfeiting, or diluting Plaintiffs' Marks; from using Plaintiffs' Marks, or any mark or trade dress similar thereto, in connection with the sale of any unauthorized goods; from using any logo, trade name or trademark or trade design that may be calculated to falsely

advertise the services or goods of Defendants as being sponsored by, authorized by, endorsed by, or in any way associated with Plaintiffs; from falsely representing themselves as being connected with Plaintiffs, through sponsorship or association, or engaging in any act that is likely to falsely cause members of the trade and/or of the purchasing public to believe any goods or services of Defendants are in any way endorsed by, approved by, and/or associated with Plaintiffs; from using any reproduction, counterfeit, infringement, copy, or colorable imitation of Plaintiffs' Marks in connection with the publicity, promotion, sale, or advertising of any goods sold by Defendants; from affixing, applying, annexing or using in connection with the sale of any goods, a false description or representation, including words or other symbols tending to falsely describe or represent Defendants' goods as being those of Plaintiffs, or in any way endorsed by Plaintiffs and from offering such goods in commerce; from engaging in search engine optimization strategies using colorable imitations of Plaintiffs' respective names or trademarks; and from otherwise unfairly competing with Plaintiffs.

b.      Entry of a temporary restraining order, as well as preliminary and permanent injunctions pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, enjoining Defendants and all third parties with actual notice of an injunction issued by the Court from participating in, including providing financial services, technical services or other support to, Defendants in connection with the sale and distribution of non-genuine goods bearing and/or using counterfeits of Plaintiffs' Marks;

c.      Entry of an order pursuant to 28 U.S.C §1651(a), The All Writs Act and the Court's inherent authority, that, upon Plaintiffs' request, the top level domain (TLD) Registry for each of the Subject Domain Names, and any other domain names being used and/or controlled by Defendants to engage in the business of marketing, offering to sell, and/or selling

46

goods bearing counterfeits and infringements of Plaintiffs' Marks, or their administrators, including backend registry operators or administrators, place the Subject Domain Names, and any other domains names used by Defendants, on Registry Hold status for the remainder of the registration period for any such domain name, thus removing them from the TLD zone files which link the Subject Domain Names, and any other domain names used by Defendants, to the IP addresses where the associated websites are hosted.

d.     Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, canceling for the life of the current registration or, at Plaintiffs' election, transferring the Subject Domain Names, and any other domain names used by Defendants to engage in their counterfeiting of Plaintiffs' Marks, to Plaintiffs' control so they may no longer be used for illegal purposes.

e.     Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, that, upon Plaintiffs' request, the applicable governing Internet marketplace website operators and/or administrators for the Seller IDs who are provided with notice of an injunction issued by the Court disable and/or cease facilitating access to the Seller IDs, and any other alias seller identification names being used and/or controlled by Defendants to engage in the business of marketing, offering to sell and/or selling goods bearing counterfeits and infringements of Plaintiffs' Marks.

f.     Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, that, upon Plaintiffs' request, any Internet marketplace website operators and/or administrators for the Seller IDs, who are provided with notice of an injunction issued by the Court identify any e-mail address known to be associated with Defendants' respective Seller ID.

g.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, that, upon Plaintiffs' request, any Internet marketplace website operators and/or administrators who are provided with notice of an injunction issued by the Court permanently remove from the multiple platforms, which include, inter alia, a Direct platform, Group platform, Seller Product Management platform, Vendor Product Management platform, and Brand Registry platform, any and all listings and associated images of goods bearing counterfeits and/or infringements of Plaintiffs' Marks via the e-commerce stores operating under the Seller IDs, and upon Plaintiffs' request, any other listings and images of goods bearing counterfeits and/or infringements of Plaintiffs' Marks associated with and/or linked to the same sellers or linked to any other alias seller identification names being used and/or controlled by Defendants to promote, offer for sale and/or sell goods bearing counterfeits and/or infringements of Plaintiffs' Marks.

h.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, that, upon Plaintiffs' request, Defendants and any Internet marketplace website operators and/or administrators who are provided with notice of an injunction issued by the Court, immediately cease fulfillment of and sequester all goods of each Defendant bearing one or more of Plaintiffs' Marks in its inventory, possession, custody, or control, and surrender those goods to Plaintiffs.

i.       Entry of an order requiring Defendants, their agent(s) or assign(s), to assign all rights, title, and interest, to their Subject Domain Name(s), and any other domains names being used by Defendants to engage in the business of marketing, offering to sell, and/or selling goods bearing counterfeits and infringements of Plaintiffs' Marks, to Plaintiffs and, if within five (5) days of entry of such order Defendants fail to make such an assignment, the Court

48

order the act to be done by another person appointed by the Court at Defendants' expense, such as the Clerk of Court, pursuant to Federal Rule of Civil Procedure 70(a)

   j. Entry of an order requiring Defendants, their agent(s) or assign(s), to instruct all search engines to permanently delist or deindex the Subject Domain Name(s), and any other domains names being used by Defendants to engage in the business of marketing, offering to sell, and/or selling goods bearing counterfeits and infringements of Plaintiffs' Marks, and, if within five (5) days of entry of such order Defendants fail to make such a written instruction, the Court order the act to be done by another person appointed by the Court at Defendants' expense, such as the Clerk of Court, pursuant to Federal Rule of Civil Procedure 70(a).

   k. Entry of an order requiring, upon Plaintiffs' request, Defendants to request in writing permanent termination of any messaging services, Seller IDs, user names, and social media accounts they own, operate, or control on any messaging service and social media platform;

   l. Entry of an order requiring Defendants to account to and pay Plaintiffs for all profits and damages resulting from Defendants' trademark counterfeiting and infringing and unfairly competitive activities and that the award to Plaintiffs be trebled, as provided for under 15 U.S.C. §1117, or, at Plaintiffs' election with respect to Count I, that Plaintiffs be awarded statutory damages from each Defendant in the amount of two million dollars ($2,000,000.00) per each counterfeit trademark used and product type sold, as provided by 15 U.S.C. §1117(c)(2) of the Lanham Act.

   m. Entry of an award pursuant to 15 U.S.C. § 1117 (a) and (b) of Plaintiffs' costs and reasonable attorneys' fees and investigative fees associated with bringing this action.

n.      Entry of an order that, upon Plaintiffs' request, Defendants and any

financial institutions, payment processors, banks, escrow services, money transmitters, or

marketplace platforms, and their related companies and affiliates, identify and restrain all funds,

up to and including the total amount of judgment, in all financial accounts and/or sub-accounts

used in connection with the Seller IDs and Subject Domain Name, or other alias seller

identification or e-commerce store names, or domain names and/or websites used by Defendants

presently or in the future, as well as any other related accounts of the same customer(s) and any

other accounts which transfer funds into the same financial institution account(s), to be

surrendered to Plaintiffs in partial satisfaction of the monetary judgment entered herein.

o.      Entry of an award of pre-judgment interest on the judgment amount.

p.      Entry of an order for any further relief as the Court may deem just and

proper.

DATED: July 13, 2020.                    Respectfully submitted,

                                         STEPHEN M. GAFFIGAN, P.A.

                                         By: **s:/Stephen M. Gaffigan/**
                                         Stephen M. Gaffigan (Fla. Bar No. 025844)
                                         Virgilio Gigante (Fla. Bar No. 082635)
                                         T. Raquel Rodriguez-Albizu (Fla. Bar. No. 103372)
                                         401 East Las Olas Blvd., #130-453
                                         Ft. Lauderdale, Florida 33301
                                         Telephone: (954) 767-4819
                                         E-mail: stephen@smgpa.net
                                         E-mail: leo@smgpa.net
                                         E-mail: raquel@smgpa.net

                                         Attorneys for Plaintiffs

## SCHEDULE "A"

**[This page is the subject of Plaintiff's Motion to File Under Seal.  As such, this page has been redacted in accordance with L.R. 5.4(b)(1)]**